1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   WILLIAM WHITE,                          No.  2:15-cv-0041-JAM-EFB P

12                 Petitioner,

13          vs.

14   FRED FOULKE,                            FINDINGS AND RECOMMENDATIONS

15                 Respondent.

16

17          Petitioner is a state prisoner proceeding without counsel with a petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.  He challenges a judgment of conviction entered

19   against him on September 14, 2011, in the San Joaquin County Superior Court on charges of

20   assault with a deadly weapon, making criminal threats, attempted murder, inflicting corporal

21   injury on a spouse, petty theft, and contempt of court.  He seeks federal habeas relief on the

22   grounds that his trial and appellate counsel rendered ineffective assistance.  Upon careful

23   consideration of the record and the applicable law, it is recommended that petitioner's application

24   for habeas corpus relief be denied.

25   **I. Background**

26          In its unpublished memorandum and opinion affirming petitioner's judgment of

27   conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

28   following factual summary:

1

A jury found defendant William White guilty of assaulting his wife Willie Ruth Dean with a deadly weapon, to wit an extension cord, on December 19, 2009 (Pen.Code,[1] § 245, subd. (a)(1); count 1); making criminal threats on December 19, 2009 (§ 422; count 2); attempting to murder Dean on January 3, 2010 (§§ 187, subd. (a), 664; count 3); inflicting corporal injury on Dean on January 3, 2010 (§ 273.5, subd. (a); count 4); and contempt of court (§ 166, subd. (c)(1); count 6).  The jury found defendant not guilty of second degree robbery (§ 211; count 5) but guilty of the lesser included offense of petty theft (§ 484) on January 3, 2010.  The jury also found true allegations defendant personally inflicted great bodily injury under circumstances involving domestic violence in the commission of counts 3 and 4 (§ 12022.7, subd. (e)), personally used a deadly weapon in the commission of counts 2, 3, and 4 (§ 12022, subd. (b)(1)), and acted with deliberation and premeditation in the commission of count 3.  In a bifurcated proceeding, the trial court found true allegations defendant had four prior serious felony convictions (§§ 667, subd. (d), 1170.12, subd. (b)) and served two prior prison terms (§ 667.5, subd. (a)).

Sentenced to 61 years to life in state prison, defendant appeals.[2]  He contends the trial court erred in (1) failing to instruct the jury sua sponte on attempted voluntary manslaughter as a lesser included offense of attempted murder, and (2) admitting evidence of a prior act of domestic violence.  He also asserts his trial counsel was ineffective in failing to move to suppress certain evidence.  Finding no error on the part of the trial court or defendant's trial counsel, we shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Prosecution's Case in Chief

Defendant and Dean had a short term relationship in the mid–1970's that produced a son, Chris.  Dean later had another son, Adrian.  Defendant and Dean kept in touch "[o]ff and on over the years" and married in 2007.

On December 19, 2009, defendant and Dean were living at 5288 Barbados Circle in Stockton.  When Dean returned home from work that evening, defendant was there but his truck was not.  Defendant told Dean the truck had gotten a flat tire.  After dinner, Dean prepared to take defendant to get his truck.  When defendant

---

[1]   Further undesignated statutory references are to the Penal Code.

[2]   Defendant was sentenced as follows: 25 years to life for attempted murder (count 3), plus a consecutive 4 years for inflicting great bodily injury and a consecutive 1 year for use of a deadly weapon; a consecutive 25 years to life for assault with a deadly weapon (count 1); a concurrent 6 months for petty theft (count 5); a concurrent 6 months for contempt of court (count 6); and a consecutive 6 years for the prior prison terms.  The trial court struck defendant's conviction for inflicting corporal injury on a spouse (count 4) as duplicative of count 3, and stayed defendant's sentence for making criminal threats (count 2) under section 654.

told Dean that she would "need to pay to get the truck," Dean told him that she did not have money to pay to get the truck and returned home. Later that evening, as Dean was watching television, defendant walked over to their Christmas tree, picked up an extension cord, and said, "I got to do what I got to do." He then walked toward Dean with the cord stretched tightly between both of his hands. Fearing defendant was going to strangle her, Dean began screaming for help. A struggle ensued. Dean eventually ran outside and used a neighbor's cell phone to call police. During the struggle, Dean ended up with the extension cord and dropped it on the lawn when she got outside. Meanwhile, defendant took Dean's keys and drove away in the Mercury Sable Dean used as her personal vehicle. The Mercury was purchased after defendant and Dean were married in 2007. Dean told the police officer who responded to her call that defendant had stolen her car. The police officer discussed obtaining an emergency protective order with Dean, and Dean indicated she wanted one. The officer was unable to locate an extension cord at the scene. Later that evening, Dean had a friend change the locks on her security door to keep defendant out.

Between December 19 and 25, 2009, defendant, who was living in a homeless shelter, telephoned Dean at least five times wanting to return home. She declined, telling him that she could not trust someone who tried to kill her and that she was divorcing him.

Between December 19, 2009, and January 3, 2010, defendant came by Dean's home three or four times. The first time was sometime prior to December 26, 2009, and Dean's son Adrian served him with the emergency protective order.

About a week after the incident, Dean boxed up all of defendant's personal items and placed them outside.

On December 29, 2009, Dean filed for divorce, and her son Adrian served defendant with the papers.

Sometime prior to January 3, 2010, the Mercury Sable was returned to Dean's driveway. She assumed defendant left it there because that is what she had asked him to do. She notified the police the car had been returned.

On January 2, 2010, defendant telephoned Dean and asked her to take him to church with her the following day. She said, "No," and they exchanged words.

The next morning, Sunday, January 3, 2010, Dean prepared to go to church. As she walked out the door, she was carrying her bible bag and purse. As she was about to turn away from the door, she "felt blows" on the top and back of her head. She looked and saw that it was defendant who was hitting her. The two scuffled and eventually ended up on the lawn in front of Dean's and her next door neighbor's home. Dean sustained additional blows to her face, head, right eye, arms, legs, and chest. She had no idea what defendant was using to strike her; however, it did not feel like a

punch, it felt like she was being hit with an object. She attempted to shield herself with her hands and arms. While she was lying on the grass, defendant took her purse and car keys and drove off in the Mercury.[3]

Dean ended up across the street but had no idea how she got there. A neighbor heard dogs barking, looked outside, and saw Dean lying on the sidewalk. Dean had been beaten. She was covered in blood and told her neighbor defendant had hit her with something as she was coming out of her house on her way to church.

Stockton Police Officer Scott Fogg responded to a report of "a person beat." When he arrived, Dean was lying on the sidewalk in front of 5291 Barbados Circle. She was not in good condition. Blood was coming from a wound to the back of her head, her arms were "swollen and deformed," and she was bleeding profusely from a cut below her right eye, which was swollen shut. Dean told Fogg who had hurt her, and Fogg "radioed to all the cars, hey, this is our suspect." He provided a description of defendant and information regarding the Mercury, including the license plate number. He also advised the other officers that defendant likes to hang out at Mariani's Liquors.

Stockton Police Officers Greg Olmstead and Neto Urias responded to Fogg's call and arrived at Mariani's at the same time. Defendant was standing next to the Mercury in the parking lot. Olmstead drew his gun and ordered defendant to his knees, and defendant complied. Defendant identified himself and was taken into custody. He had blood on his hands and clothing and did not appear to be injured. Stockton Police Officer John Hernandez also responded to Fogg's call and arrived as defendant was being taken into custody.

After defendant was taken into custody, Officer Olmstead returned to the Mercury and saw what appeared to be blood on the exterior of the driver's side of the car. Officers Olmstead and Hernandez searched the passenger compartment of the Mercury. Olmstead searched the driver's side and saw what appeared to be blood on the interior of the door, the steering wheel, and the center console. Hernandez searched the passenger side and did not find anything of interest. Thereafter, Hernandez searched the trunk where he found a small, wooden bat that appeared to have blood on it and Dean's purse. At the time he searched the Mercury, including the trunk, Hernandez knew there had been an assault and that defendant may have been involved.

In June 2007, Dean's brother was living with Dean and defendant. Dean's brother and defendant got into a fight, Dean got involved, and defendant "scraped" her on the arm with a knife. Dean does not know whether defendant intended to hurt her. The police were called, but Dean did not want to press charges because she believed the fight was between defendant and her brother. As a result of the

---

[3]   During cross-examination, Dean acknowledged that she did not actually see defendant take these items from her.

injury to her arm, Dean has "tingling and numbness and nerve damage and muscle damage" to three fingers on her right hand.

## B. The Defense

Defendant testified on his behalf at trial.  On the evening of December 19, 2009, he was illegally dumping some building materials in an area off of Highway 99 and observed Dean's Mercury and a male friend's truck parked up the street.  Dean and her friend left in their respective vehicles after observing defendant.  When defendant went to leave, he discovered his truck had a flat tire.  A man at a nearby Home Depot drove him home.

Dean returned home later that evening and asked defendant where his truck was located.  Defendant responded that Dean knew where the truck was because she had seen defendant earlier that evening.  Defendant dropped the topic when Dean began waving around a kitchen knife she was using to cut lettuce.  After dinner, they left to get defendant's truck but never made it past the driveway.  When defendant informed Dean he needed money to have the tire repaired, she said she was not going to give him anything and went back inside.

Later that night, Dean asked defendant if he planned to finish decorating their Christmas tree, and defendant responded, "I guess I got to do what I got to do."  As defendant got to work on the tree, Dean came at him with a kitchen knife.  Defendant grabbed an extension cord to protect himself.  He wrapped the cord around Dean's hands and pushed her.  They both fell over, and defendant's wrist was cut in the process.  Dean got up and ran out the door.  Defendant did not call the police because he did not want Dean to lose her nursing license.  He wanted to let things cool down, so he left in the Mercury.  He denied taking any money from Dean's purse, explaining that he had $40 in his pocket that day.[4]  Dean called him later that night, and he told her he would bring the car back as soon as he got his truck fixed.  He returned the car two or three days later.

Between December 19, 2009, and January 3, 2010, Dean called defendant nearly every day.  She invited defendant over three or four separate times, but defendant told her he "want[ed] to get away, get back to me fish."

Dean called defendant on January 2, 2010, to remind him that January 3d is their son's birthday.  She also told him that if he got to her home in time, she might let him go with her to church the next day.

The following day, January 3, 2010, defendant arrived at Dean's home at 8:00 a.m. and waited outside.  When he heard Dean inside the garage, he knocked on the garage door and told her he was outside.  She said, "Okay."  Dean came outside a few minutes later, placed her purse and another bag in the trunk of the Mercury, and

---

[4]  Defendant previously testified that he "didn't have any money at that time."

5

moved the car from the driveway to the street. As Dean walked back to the house, she handed defendant her phone so that he could call his son. Defendant attempted to hand Dean some divorce papers, but she refused to take them.

When Dean came back outside, she had a coat draped over her left arm, and defendant noticed that her demeanor had changed. She had the "[s]ame old crazy look" on her face that she had on December 19, 2009, when she came at him with the knife. As Dean came toward him, she dropped her coat, and revealed she was carrying a knife with a four- to five-inch blade. Defendant told her to put the knife down, and Dean said, "No. You trying to take everything from me. I'm not going to let you take nothing from me." When Dean continued toward defendant, he picked up a little twig and began hitting Dean on the hand so that she would drop the knife. Dean took off "running across the way." Defendant picked up Dean's keys, which she had dropped, got into the Mercury, and attempted to look for her. As he was driving down the street, Dean ran in front of the car and defendant accidently ran her over. Dean was pinned underneath the car, and there was "a lot of blood coming out from under there." Defendant got the jack out of the trunk, jacked up the car, pulled Dean out, placed her on the sidewalk, rang a neighbor's doorbell, drove to the end of the street, and waited a few minutes until he saw someone come out and check on Dean. Then he drove away.

According to defendant, the incident in 2007 was between him and Dean's brother. Dean was "not included." On cross-examination, he acknowledged he was convicted of battery on a spouse, assault with a deadly weapon (a knife), and brandishing a knife as a result of the 2007 incident. He also admitted prior convictions for aggravated robbery, bank robbery, possession of a firearm, voluntary manslaughter, and assault with intent to commit robbery by use of a deadly weapon.

## C. The Rebuttal

Following his arrest, defendant was interviewed by a police detective. Defendant told the detective he called Dean nearly every day between December 19, 2009, and January 3, 2010. He was upset about having to live at a shelter. He also was upset Dean had filed for divorce, explaining that she had promised his mother she would take care of him for the rest of his life. Defendant spoke to Dean on January 2, 2010, and told her he would be serving her with divorce papers. The next morning, he took a bus from the homeless shelter to Dean's house and waited outside. When Dean emerged from the house, defendant attempted to serve her with the divorce papers. Dean cursed at him and went back inside. When she reemerged a few minutes later, she continued cursing at him, and he felt like he was under attack. He thought Dean had a knife. He "lost it," "blacked out," and did not remember what exactly happened. "[H]e was so frustrated about his living situation and the way that he felt he was being treated by Ms. Dean's son that he couldn't take it anymore, and that this anger had built up inside him so much that he knew that he hurt Ms. Dean very severely and that

he was really sorry, but he couldn't help it." He found a stick on the lawn that he used to hit her. After striking her with the stick, he took her car keys and purse and left in the Mercury. When the detective told him no knife was found at the scene, defendant said he must have seen something that resembled a knife, such as Dean's keys. He denied striking Dean with a baseball bat or knowing anything about the bat found in the trunk of Dean's car. He did not say anything about accidentally striking Dean with the car. He repeatedly said he was sorry and offered to and did write Dean an apology letter.

Officer Fogg "walked the scene" within minutes of arriving at Barbados Circle on January 3, 2010, including the grass area in front of Dean's and Dean's next door neighbors' homes, and did not locate a knife. He did observe a large amount of blood in the grass in front of Dean's next door neighbor's home. There were also blood drops from the sidewalk in front of Dean's next door neighbor's home "all the way over to where [Fogg] located Ms. Dean in the driveway/sidewalk area of 5291" Barbados Circle. Fogg did not see a large amount of blood in the street. Nor did he observe any drag marks, just drops of blood.

*People v. White*, No. C069675, 2013 WL 3868166, at *1-4 (Cal. Ct. App. July 25, 2013).

## II. Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. *See Wilson v. Corcoran*, 562 U.S. 1,5 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

/////

1    For purposes of applying § 2254(d)(1), "clearly established federal law" consists of

2  holdings of the United States Supreme Court at the time of the last reasoned state court decision.

3  *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, ___ U.S.

4  ___, 132 S.Ct. 38 (2011); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v.*

5  *Taylor*, 529 U.S. 362, 405-06 (2000)).  Circuit court precedent "may be persuasive in determining

6  what law is clearly established and whether a state court applied that law unreasonably." *Stanley*,

7  633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)).  However, circuit

8  precedent may not be "used to refine or sharpen a general principle of Supreme Court

9  jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall*

10  *v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155

11  (2012) (per curiam)).  Nor may it be used to "determine whether a particular rule of law is so

12  widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court,

13  be accepted as correct. *Id.*  Further, where courts of appeals have diverged in their treatment of

14  an issue, it cannot be said that there is "clearly established Federal law" governing that issue.

15  *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

16    A state court decision is "contrary to" clearly established federal law if it applies a rule

17  contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

18  precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003).

19  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

20  writ if the state court identifies the correct governing legal principle from the Supreme Court's

21  decisions, but unreasonably applies that principle to the facts of the prisoner's case. [5] *Lockyer v.*

22  *Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002

23  (9th Cir. 2004).  In this regard, a federal habeas court "may not issue the writ simply because that

24  court concludes in its independent judgment that the relevant state-court decision applied clearly

25  established federal law erroneously or incorrectly.  Rather, that application must also be

26  ───────────

27    [5]   Under § 2254(d)(2), a state court decision based on a factual determination is not to be
    overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
    presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*,
28  384 F.3d 628, 638 (9th Cir. 2004)).

1   unreasonable." *Williams*, 529 U.S. at 412.  *See also Schriro v. Landrigan*, 550 U.S. 465, 473

2   (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent

3   review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'").

4   "A state court's determination that a claim lacks merit precludes federal habeas relief so long as

5   'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v.*

6   *Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

7   Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

8   must show that the state court's ruling on the claim being presented in federal court was so

9   lacking in justification that there was an error well understood and comprehended in existing law

10  beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

11      If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

12  court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*,

13  527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008)

14  (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of §

15  2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering

16  de novo the constitutional issues raised.").

17      The court looks to the last reasoned state court decision as the basis for the state court

18  judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).  If

19  the last reasoned state court decision adopts or substantially incorporates the reasoning from a

20  previous state court decision, this court may consider both decisions to ascertain the reasoning of

21  the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  "When

22  a federal claim has been presented to a state court and the state court has denied relief, it may be

23  presumed that the state court adjudicated the claim on the merits in the absence of any indication

24  or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99.  This presumption

25  may be overcome by a showing "there is reason to think some other explanation for the state

26  court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

27  Similarly, when a state court decision on a petitioner's claims rejects some claims but does not

28  expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

9

1  the federal claim was adjudicated on the merits. *Johnson v. Williams*, ___ U.S. ___, ___, 133

2  S.Ct. 1088, 1091 (2013).

3          Where the state court reaches a decision on the merits but provides no reasoning to

4  support its conclusion, a federal habeas court independently reviews the record to determine

5  whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v.*

6  *Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).   "Independent review of the record is not de novo

7  review of the constitutional issue, but rather, the only method by which we can determine whether

8  a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853.  Where no

9  reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

10  reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

11          A summary denial is presumed to be a denial on the merits of the petitioner's claims.

12  *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012).  While the federal court cannot analyze

13  just what the state court did when it issued a summary denial, the federal court must review the

14  state court record to determine whether there was any "reasonable basis for the state court to deny

15  relief." *Richter*, 562 U.S. at 98.  This court "must determine what arguments or theories ... could

16  have supported, the state court's decision; and then it must ask whether it is possible fairminded

17  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

18  decision of [the Supreme] Court." *Id.* at 102.  The petitioner bears "the burden to demonstrate

19  that 'there was no reasonable basis for the state court to deny relief.'" *Walker v. Martel*, 709 F.3d

20  925, 939 (9th Cir. 2013) (quoting *Richter*, 562 U.S. at 98).

21          When it is clear, however, that a state court has not reached the merits of a petitioner's

22  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

23  habeas court must review the claim de novo. *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462

24  F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

25  **III.  Petitioner's Claims**

26          **A.  Motion to Suppress**

27          In his first three grounds for relief, petitioner claims that his trial counsel rendered

28  ineffective assistance in failing to file a motion to suppress the evidence found in the trunk of

1   petitioner's vehicle. ECF No. 1 at 5, 10. [6] Petitioner notes that he was in handcuffs and seated in

2   a locked police car during the search. *Id.* at 5. He also notes that his car was a "community-

3   property via marriage vehicle." *Id.* Petitioner argues that "the warrantless search exceeded the

4   scope incident to the arrest." *Id.*

5          Petitioner also claims that his appellate counsel rendered ineffective assistance in failing

6   to raise a claim that trial counsel was ineffective in failing to file a motion to suppress.

7          **1. State Court Decision**

8          The California Court of Appeal rejected these arguments, concluding that the search of

9   petitioner's vehicle, including the trunk, was justified under the "automobile exception" to the

10  warrant requirement. The court reasoned as follows:

11         **Defendant's Trial Counsel Was Not Ineffective for Failing to**
           **Move to Suppress the Items Found in the Trunk of the Mercury**
12         **Because the Search Was Proper Under the Automobile**
           **Exception**
13

14         Defendant next contends "[t]he warrantless search of the trunk . . .
           exceeded the lawful scope of a search incident to arrest; [and] trial
15         counsel's failure to object deprived [defendant] of the Sixth
           Amendment right to effective assistance of counsel, requiring
16         reversal of counts three [attempted murder] and five [petty theft]."
           Again, we disagree.

17         A defendant claiming ineffective assistance of counsel has the
           burden to show: (1) counsel's performance was deficient, falling
18         below an objective standard of reasonableness under prevailing
           professional norms; and (2) the deficient performance resulted in
19         prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–
           688 [80 L.Ed.2d 674, 693] (*Strickland*); *People v. Ledesma* (1987)
20         43 Cal.3d 171, 216–218.) Prejudice is shown when "there is a
           reasonable probability that, but for counsel's unprofessional errors,
21         the result of the proceeding would have been different. A
           reasonable probability is a probability sufficient to undermine
22         confidence in the outcome." (*Strickland, supra*, 466 U.S. at p. 694
           [80 L.Ed.2d at p. 698].) Where, as here, the claim is based on trial
23         counsel's failure to object or make a motion, a defendant must
           prove not only the absence of a reasonable tactical explanation for
24         the omission but also that the objection or motion would have been
           meritorious. (*People v. MacKenzie* (1995) 34 Cal.App.4th 1256,
25         1272.)

26

27

28       [6] Page number citations such as this one are to the page numbers reflected on the court's
    CM/ECF system and not to page numbers assigned by the parties.

Whether a search is unreasonable under the Constitution is a question of law.  (*People v. Lawler* (1973) 9 Cal.3d 156, 160.)  Under the California Constitution, the reasonableness of a search and seizure is measured against federal constitutional standards. (*People v. Woods* (1999) 21 Cal.4th 668, 674.)  Under the Fourth Amendment to the United States Constitution, a warrantless search is presumed to be illegal, subject to a few exceptions. (*Ibid.*)

Here, defendant does not contest the legality of his arrest or the search of the car's passenger compartment.  Instead, he disputes the legality of the search of the car's trunk incident to his arrest.[7] Defendant cites *Arizona v. Gant* (2009) 556 U.S. 332 [173 L.Ed.2d 485] (*Gant*) for the proposition that "the warrantless search of the trunk of [his] car exceeded the lawful scope of a search incident to arrest."  In *Gant*, the United States Supreme Court held that the police may "search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" or "it is reasonable to believe that evidence [relevant to] the offense of arrest might be found in the vehicle."[8]  (*Id.* at pp. 343, 335 [173 L.Ed.2d at pp. 496, 491], fn. omitted.)  We need not consider whether the search of the trunk exceeded the lawful scope of a search incident to arrest because we find it was justified under the automobile exception to the search warrant requirement.

"If there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross*, 456 U.S. 798, 820–821, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) [(*Ross*)], authorizes a search of *any* area of the vehicle in which the evidence might be found." (*Gant, supra*, 556 U.S. 347 [173 L.Ed.2d at p. 498], italics added.) "'Probable cause means "a fair probability that contraband or evidence of a crime will be found . . . .""'  (*Alabama v. White* (1990) 496 U.S. 325, 330 [110 L.Ed.2d 301, 308].)  Probable cause to search thus exists when the "known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found . . . ." (*Ornelas v. United States* (1996) 517 U.S. 690, 696 [134 L.Ed.2d 911, 918].)  A probable cause determination "must be based on objective facts that could justify the issuance of a warrant by a

_____

[7]  For purposes of this appeal, we shall assume defendant has standing to challenge the search.  While we sometimes refer to the Mercury as "Dean's car" because she was the primary driver, it is undisputed the Mercury was purchased during Dean's marriage to defendant.  The People do not challenge defendant's standing to challenge the search of the trunk.

[8]  The vehicle search *Gant* authorizes when it is reasonable to believe evidence relevant to the offense of arrest might be found in the vehicle appears to be limited to the "passenger compartment" and "any containers therein," (*Gant, supra*, 556 U.S. at p. 344 [173 L.Ed.2d at p. 496] ), and, traditionally, the passenger compartment has not included the trunk (*New York v. Belton* (1981) 453 U.S. 454, 461 fn. 4 [69 L.Ed.2d 768, 775 fn. 4] ).  (*See also United States v. Arnold* (E.D. Mich. Sept. 23, 2009, No. 08–20556) 2009 U.S. Dist. LEXIS 87215, *23–*25 [concluding that *Gant* did not authorize a trunk search].)  Accordingly, we analyze the legality of the trunk search under another doctrine.

1

magistrate and not merely on the subjective good faith of the police officers." (*Ross, supra*, 456 U.S. at p. 808 [72 L.Ed.2d at p. 583].)

2

3

Officer Hernandez had probable cause to believe the trunk contained evidence of criminal activity when he searched it. At the time he searched the Mercury, he knew defendant was a suspect in an assault. He arrived at the liquor store just as defendant was being detained. After defendant was taken into custody, Officers Olmstead and Hernandez searched the Mercury. Olmstead saw what appeared to be blood on the exterior of the driver's side of the car. Olmstead also saw what appeared to be blood on the interior of the door, the steering wheel, and the center console. Hernandez searched the passenger side of the car and did not find anything of interest. Thereafter, he searched the trunk where he found a small wooden bat that appeared to have blood on it and Dean's purse. While Hernandez did not testify that he had seen what appeared to be blood on or in the Mercury, it is inconceivable that he was not aware of its presence given that he searched the passenger side of the passenger compartment while Olmstead searched the driver's side. These facts provided Hernandez with probable cause to believe the car contained evidence of criminal activity. (*See People v. Kraft* (2000) 23 Cal.4th 978, 1044 ["Having found a substance suspected to be *blood*, searching officers clearly had probable cause to believe criminal activity had occurred in the car . . . ."], underscore added.) Accordingly, he could lawfully search "any area of the vehicle in which the evidence might be found." (*Gant, supra*, 556 U.S. 347 [173 L.Ed.2d at p. 498].)

4

5

6

7

8

9

10

11

12

13

14

15

Because Officer Hernandez's search of the trunk was lawful under the automobile exception to the search warrant requirement, we reject defendant's claim that his trial counsel rendered ineffective assistance by failing to move to suppress the evidence found during that search.[9]  (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 836 ["Counsel's failure to make a futile or unmeritorious motion or request is not ineffective assistance."].)

16

17

18

19

*People v. White*, No. C069675, 2013 WL 3868166, at \*6-8 (Cal. Ct. App. July 25, 2013).

20

### 2. <u>Applicable Legal Principles</u>

21

The applicable legal standards for a claim of ineffective assistance of counsel are set forth

22

in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a *Strickland* claim, a defendant

23

must show that (1) his counsel's performance was deficient and that (2) the "deficient

24

performance prejudiced the defense." *Id.* at 687. Counsel is constitutionally deficient if his or

25

her representation "fell below an objective standard of reasonableness" such that it was outside

26

27

28

---

[9]  Because we find the search was lawful under the automobile exception, we need not address the People's claim "[t]he search was proper as an inventory search and as a search incident to arrest . . . ."

1   "the range of competence demanded of attorneys in criminal cases." *Id.* at 687–88 (internal

2   quotation marks omitted).  "Counsel's errors must be 'so serious as to deprive the defendant of a

3   fair trial, a trial whose result is reliable.'" *Richter*, 131 S.Ct. at 787-88 (quoting *Strickland*, 466

4   U.S. at 687).

5         A reviewing court is required to make every effort "to eliminate the distorting effects of

6   hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the

7   conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 669; *see Richter*, 131

8   S.Ct. at 789.  Reviewing courts must also "indulge a strong presumption that counsel's conduct

9   falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

10  This presumption of reasonableness means that the court must "give the attorneys the benefit of

11  the doubt," and must also "affirmatively entertain the range of possible reasons [defense] counsel

12  may have had for proceeding as they did." *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011)

13  (internal quotation marks and alterations omitted).

14        Prejudice is found where "there is a reasonable probability that, but for counsel's

15  unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466

16  U.S. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the

17  outcome." *Id.*  "The likelihood of a different result must be substantial, not just conceivable."

18  *Richter*, 131 S.Ct. at 792.  A reviewing court "need not first determine whether counsel's

19  performance was deficient before examining the prejudice suffered by the defendant as a result of

20  the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of

21  lack of sufficient prejudice . . . that course should be followed." *Strickland*, 466 U.S. at 697.

22        It is clearly established federal law that the failure of trial counsel to file a motion to

23  suppress may support a claim of ineffective assistance of counsel. *Premo v. Moore*, 562 U.S.

24  115, 122 (2011); *Kimmelman v. Morrison*, 477 U.S. 365, 383 (1986).  In order to prevail on the

25  deficient performance prong of *Strickland*, a petitioner must demonstrate that his counsel's failure

26  to file such a motion "fell below an objective standard of reasonableness." *Strickland*, 466 U.S.

27  at 687-88.  In order to demonstrate prejudice, a petitioner must demonstrate that: (1) the motion is

28  meritorious, and (2) the verdict would have been different absent the excludable evidence.

1  *Kimmelman*, 477 U.S. at 375; *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (citing

2  *Kimmelman*, 477 U.S. at 373-74) (so stating with respect to failure to file a motion to suppress on

3  Fourth Amendment grounds)).  *See also Ceja v. Stewart*, 97 F.3d 1246, 1253 (9th Cir. 1996)

4  (Trial counsel is not ineffective in failing to file a suppression motion "which would have been

5  'meritless on the facts and the law[.]'"); *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994) (failure

6  to file suppression motion is not ineffective assistance where counsel investigated filing the

7  motion and there was no reasonable possibility that the evidence would have been suppressed);

8  *United States v. Molina*, 934 F.2d 1440, 1447 (9th Cir. 1991) (Counsel did not render ineffective

9  assistance by failing to file a motion to suppress that was "clearly lacking in merit[.]").

10       The *Strickland* standards apply to appellate counsel as well as trial counsel.  *Smith v.*

11  *Murray*, 477 U.S. 527, 535-36 (1986); *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989).

12  However, an indigent defendant "does not have a constitutional right to compel appointed counsel

13  to press nonfrivolous points requested by the client, if counsel, as a matter of professional

14  judgment, decides not to present those points."  *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

15  Counsel "must be allowed to decide what issues are to be pressed."  *Id.*  Otherwise, the ability of

16  counsel to present the client's case in accord with counsel's professional evaluation would be

17  "seriously undermined."  *Id.  See also Smith v. Stewart*, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998)

18  (Counsel is not required to file "kitchen-sink briefs" because it "is not necessary, and is not even

19  particularly good appellate advocacy.")  There is, of course, no obligation to raise meritless

20  arguments on a client's behalf.  *See Strickland*, 466 U.S. at 687-88 (requiring a showing of

21  deficient performance as well as prejudice).  Thus, counsel is not deficient for failing to raise a

22  weak issue.  *See Miller*, 882 F.2d at 1434.  In order to establish prejudice in this context,

23  petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on

24  appeal.  *Id.* at 1434 n.9.

                    **3.  <u>Analysis</u>**

26       "The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a

27  cardinal principle that 'searches conducted outside the judicial process, without prior approval by

28  judge or magistrate, are per se unreasonable under the Fourth Amendment-subject to a few

1    specifically established and well-delineated exceptions.'" *Mincey v. Arizona*, 437 U.S. 385, 390

2    (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  One such exception to the

3    warrant requirement is the automobile exception.  *Carroll v. United States*, 267 U.S. 132, 153-56

4    (1925).  Pursuant to the automobile exception, "police may conduct a warrantless search of a

5    vehicle if there is probable cause to believe that the vehicle contains evidence of a crime."  *United*

6    *States v. Scott*, 705 F.3d 410, 417 (9th Cir. 2012) (quoting *United States v. Brooks*, 610 F.3d

7    1186, 1193 (9th Cir. 2010)).  The applicability of this exception "does not turn on whether the

8    car's owner or driver has already been taken into custody or the risk of mobility has otherwise

9    been eliminated."  *Id.* at 416.  *See also United States v. Davis*, 530 F.3d 1069, 1084 (9th Cir.

10   2008) (upholding search of legally parked car that followed the arrest of that car's driver); *United*

11   *States v. Hatley*, 15 F.3d 856, 858, 860 (9th Cir. 1994) (upholding vehicle search conducted after

12   police stopped defendant in his vehicle and returned him to his residence)).  Further, the doctrine

13   permits law enforcement agents to search all parts of a vehicle for contraband when probable

14   cause exists for the initial search.  *United States v. Ross*, 456 U.S. 798, 824 (1982) ("If probable

15   cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the

16   vehicle and its contents that may conceal the object of the search.").

17          The decision of the California Court of Appeal that the search of petitioner's vehicle was

18   justified by the automobile exception to the warrant requirement is not objectively unreasonable

19   and should not be set aside.  In this case, there was probable cause to believe that petitioner's

20   vehicle contained evidence of a crime.  As noted by the California Court of Appeal, the police

21   knew petitioner was a suspect in an assault where the victim was covered in blood, petitioner was

22   apprehended shortly after the assault occurred and was found to have blood on his hands and

23   clothing, and there was blood on the exterior and the interior of petitioner's vehicle.  When a

24   search of the interior of the car did not reveal any contraband, the police were justified under the

25   automobile exception in looking in the trunk.  Under these circumstances, a motion challenging

26   the admissibility of the evidence found in the trunk would have been meritless.  An attorney's

27   failure to make a meritless objection or motion does not constitute ineffective assistance of

28   /////

1    counsel.  *Jones v. Smith*, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (citing *Boag v. Raines*, 769 F.2d

2    1341, 1344 (9th Cir. 1985)).

3         Petitioner has also failed to demonstrate that "the verdict would have been different absent

4    the excludable evidence."  *Kimmelman*, 477 U.S. at 375.  As noted by respondent, "even

5    excluding the challenged evidence, the remaining evidence presented to the jury, including the

6    testimony of the victim, the officers, and the detective who interviewed [petitioner] after he was

7    arrested, provided ample evidence of [petitioner's] guilt."  ECF No. 14 at 13.  Even in the absence

8    of the bat and purse found in the vehicle, the jury would have received overwhelming evidence of

9    petitioner's guilt of the charged crimes.

10        Petitioner has also failed to show that an appellate claim that trial counsel rendered

11   ineffective assistance in failing to file a motion to suppress would have been meritorious.  As set

12   forth above, there is no obligation to raise meritless arguments on a client's behalf.  Appellate

13   counsel's decision to press claims with arguably more merit than the claims now suggested by

14   petitioner was well "within the range of competence demanded of attorneys in criminal cases."

15   *McMann v. Richardson*, 397 U.S. 759, 771 (1970).  *See also Smith v. Robbins*, 528 U.S. 259, 288

16   (2000) ("appellate counsel who files a merits brief need not (and should not) raise every

17   nonfrivolous claim, but rather may select from among them in order to maximize the likelihood

18   of success on appeal"); *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1985) ("Generally, only when

19   ignored issues are clearly stronger than those presented, will the presumption of effective

20   assistance of counsel be overcome").

21        For the foregoing reasons, petitioner is not entitled to habeas relief on these claims of

22   ineffective assistance of trial and appellate counsel.[10]

23   /////

24   /////

25   _____

26   [10]  Petitioner also argues that his trial counsel should have challenged the legality of his
     arrest and the search of the passenger compartment of the vehicle.  No incriminating evidence
27   was found in the passenger compartment and there is significant evidence that the police had
     probable cause to arrest petitioner.  Accordingly, petitioner is unable to show prejudice with
28   respect to these claims and they should be denied.

**B. Failure to Conduct a DNA Test on Baseball Bat**

In his final ground for relief, petitioner claims that his trial counsel rendered ineffective assistance in failing to conduct DNA and fingerprint testing of the "bat and stick" found in the vehicle. ECF No. 1 at 6. He states that, if such tests had been conducted, they would have shown that there was no blood on either the bat or the stick. *Id.* Petitioner also claims that his appellate counsel rendered ineffective assistance in failing to raise a claim of ineffective assistance of trial counsel on this basis. *Id.*

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "This includes a duty to . . . investigate and introduce into evidence records that demonstrate factual innocence, or that raise sufficient doubt on that question to undermine confidence in the verdict." *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001), *amended by* 253 F.3d 1150 (9th Cir. 2001) (citing *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999)). On the other hand, where an attorney has consciously decided not to conduct further investigation because of reasonable tactical evaluations, his or her performance is not constitutionally deficient. *See Babbitt v. Calderon*, 151 F.3d 1170, 1173 (9th Cir. 1998). "A decision not to investigate thus 'must be directly assessed for reasonableness in all the circumstances.'" *Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (quoting *Strickland*, 466 U.S. at 691). In order to show prejudice, petitioner must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S.Ct. at 792.

Petitioner has failed to demonstrate either deficient performance or prejudice with respect to this claim. With respect to deficient performance, trial counsel may have decided not to conduct forensic testing of the bat, knowing that in all probability it would show the presence of blood. With regard to prejudice, petitioner's conclusory allegations that DNA testing might have shown the absence of blood on the bat and stick is clearly insufficient for this purpose. *See Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995) ("conclusory suggestions" and "bald assertions" fall short of stating an ineffective assistance of counsel claim and do not entitle the petitioner to an

18

evidentiary hearing).  *See also Bragg*, 242 F.3d at 1088 (petitioner failed to establish prejudice where he did "nothing more than speculate that, if interviewed," the witness would have given helpful information); *Villafuerte v. Stewart*, 111 F.3d 616, 632 (9th Cir. 1997) (petitioner's ineffective assistance claim denied where he presented no evidence concerning what counsel would have found had he investigated further, or what lengthier preparation would have accomplished); *Hendricks v. Calderon*, 70 F.3d 1032, 1042 (9th Cir. 1995) ("Absent an account of what beneficial evidence investigation into any of these issues would have turned up, Hendricks cannot meet the prejudice prong of the *Strickland* test).  The implication that further investigation by counsel may have uncovered exculpatory evidence is insufficient to establish prejudice.

In sum, these ineffective assistance of counsel claims are conclusory, lack support, and fail to demonstrate that petitioner suffered prejudice as a result of the performance of his trial or appellate counsel.  The decision of the state courts rejecting these claims is not contrary to or an unreasonable application of *Strickland*.  Accordingly, petitioner is not entitled to federal habeas relief.

**IV. Conclusion**

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  *See* Rule 11, Rules Governing Section

1   2254 Cases (the district court must issue or deny a certificate of appealability when it enters a

2   final order adverse to the applicant).

3   DATED:  December 15, 2016.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

20